AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT

04/02/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

April 2, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Sequoia Edwards | ) | Case No. |
| | ) | 5:21-mj-00239 |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 2020 to August 2020_____ in the county of _____Riverside_____ in the

_____Central_____ District of _____California_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Sections 1040, and 1343 | Fraud in Connection with Emergency Benefits and Wire Fraud. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Stephen Harrison, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____04/~~01~~/2021_____ (02)

_____
*Judge's signature*

City and state: _____Riverside, California_____       Honorable Magistrate Judge Sheri Pym
*Printed name and title*

*AUSA:* B. Tuyay

**AFFIDAVIT**

I, Stephen Harrison, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2019.  I am currently assigned to the Los Angeles Division, Riverside Resident Agency, where my duties include the investigation of bank fraud, wire fraud, and money laundering. I have received 21 weeks (approximately 840 hours) of instruction in the fundamentals of law, ethics, behavioral science, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the FBI Academy in Quantico, Virginia.  During my employment with the FBI, I have participated in a variety of investigations, including drug trafficking, violent crimes, fugitives, bank fraud, wire fraud, money laundering, and public corruption.

2.    I have received instruction on the identification, collection, and preservation of evidence, photography, latent fingerprint collection, and crime scene investigations.  I have also completed hundreds of hours of criminal investigation, including compiling information; interviewing victims, witnesses, and suspects; and collecting evidence to support the filing of criminal complaints and search warrants.

3.    During the course of my investigations, I have interviewed witnesses, conducted physical surveillance, executed arrest and search warrants, and reviewed various forms of

evidence including telephone call detail records, bank records, invoices, photographs, recorded telephone calls, and other miscellaneous financial documents.  Through my training, education, and experience, I have become familiar with a variety of fraud schemes.

4.    In addition to my formal training and personal experiences, I have learned from and worked alongside experienced senior FBI agents in various criminal investigations including, but not limited to, corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading. These senior agents have provided me with guidance, training, and hands-on experience in various investigative techniques including, interviewing, surveillance, financial analysis, and the identification and tracing of illicit proceeds.

## II. **PURPOSE OF AFFIDAVIT**

5.    I make this affidavit in support for the issuance of a criminal complaint and arrest warrant against Sequoia Edwards ("EDWARDS"), for a violation of Title 18, United States Code, Sections 1040 (Fraud in Connection with Emergency Benefits) and 1343 (Wire Fraud).

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. BACKGROUND INFORMATION ON UNEMPLOYMENT INSURANCE BENEFITS AND COVID-19-RELATED FRAUD

#### A.    Unemployment Benefits

7.    Since 1935, the DOL's UI program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own.  This program ensures that at least a significant portion of the necessities of life -- most notably food, shelter, and clothing -- are met on a weekly basis while the worker seeks employment.  UI beneficiaries who meet the requirements of the applicable state law are eligible for this temporary financial assistance.  Each state administers a separate UI program within the guidelines established by federal law.  In the state of California, the EDD administers the UI program for residents and others physically performing work activities in California.

8.    Generally speaking, regular UI claimants must be: (1) unemployed through no fault of their own; (2) able and available for work; (3) willing to accept suitable work; and (4) actively seeking work.

#### B.    PUA Under the CARES Act

9.    On March 13, 2020, the President of the United States declared the COVID-19 pandemic an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  On March 27, 2020, the CARES Act was enacted to provide emergency assistance and health care response for individuals, families,

and businesses affected by the COVID-19 pandemic.  The CARES Act
included, among others, the establishment of (1) PUA benefits to
provide financial assistance to individuals who are out of work
due to the pandemic, including those who do not usually qualify
for regular state UI such as self-employed, contract, and "gig
workers," (2) the Pandemic Emergency Unemployment Compensation
("PEUC") benefit, a 13-week benefit extension for people who
have used all benefits available in their regular UI claim, and
(3) the Pandemic Additional Compensation ("PAC") benefit, an
additional $600 federal stimulus payment automatically added to
each week of benefits received between March 29, 2020 and July
25, 2020.

     10.  On August 8, 2020, after Federal Pandemic Unemployment
Compensation ("FPUC") expired, the President signed a
Presidential Memorandum authorizing the Federal Emergency
Management Agency ("FEMA") to use disaster relief funds pursuant
to Section 408 Other Needs Assistance of the Stafford Act to
provide supplemental payments for lost wages to help ease the
financial burden on individuals who were unemployed as a result
of COVID-19.  The "Lost Wages Assistance Program" ("LWAP")
served as a temporary measure to provide an additional $300 per
week via a total of $44 billion in FEMA funds.  The period of
assistance for LWAP is August 1, 2020 to December 27, 2020, or
termination of the program, whichever is sooner.

     11.  On December 27, 2020, the President signed into law
the Consolidated Appropriations Act of 2021.  The guidance
provided states with important information about several

provisions of the law, including the extension of programs first authorized by the CARES Act earlier in the year, as well as the creation of a new UI benefit for "mixed earners."

12.  The law extended the PUA program created by the CARES Act, which provides UI benefits to gig workers and others not traditionally eligible for them.  Under the law, the end of the period of applicability for the PUA program extended to those weeks of unemployment ending on or before March 14, 2021.  In states where the week of unemployment ends on a Sunday, the last payable week of PUA was the week ending March 14, 2021 (March 13 if weeks of unemployment end on Saturday).  For individuals on PUA who have not exhausted their benefit eligibility of up to 50 weeks, the program also provided for continuing benefits for eligible individuals for weeks of unemployment through April 5, 2021.  The law also strengthened documentation requirements to ensure PUA program integrity.

13.  Additionally, FPUC, which expired July 31, 2020, was reauthorized and modified to provide $300 per week to supplement benefits for weeks of unemployment beginning after December 26, 2020 and ending on March 14, 2021, which was extended to September 4, 2021 by the COVID-19 Relief Bill.  FPUC was not payable with respect to any week during the gap in applicability, that is, weeks of unemployment ending after July 31, 2020, through weeks of unemployment ending on or before December 26, 2020.

14.  In addition, the time period for receiving the PEUC benefit was extended from December 27, 2020 to March 14, 2021,

then through September 4, 2021, and the number of weeks that an individual could claim PEUC benefits was increased from 13 to 24 weeks.

15.  Prior to the enactment of the CARES Act, to be eligible for UI administered by the EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim.  Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

16.  The CARES Act established a new program -- PUA -- to provide unemployment benefits during the coronavirus pandemic to people who do not qualify for regular UI benefits including business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic.  UI benefits provided under the PUA program are sometimes referred to as PUA benefits.

17.  Under the PUA program, workers who are not eligible for regular UI benefits but are unemployed or partially unemployed for a COVID-19-related reason[1] permissible under

---

[1] COVID-19-related reasons for being out of work include: being diagnosed with COVID-19 or experiencing symptoms of COVID19 and seeking a medical diagnosis; being unable to work because a health care provider advised self-quarantining due to concerns related to COVID-19; having a household member who has been diagnosed with COVID-19; providing care for a family or household member who has been diagnosed with COVID-19; having

federal law may receive unemployment benefits for up to 46 weeks.  Under the PEUC program, workers who are eligible for the regular UI benefits for up to 26 weeks may receive an additional 13 weeks of benefits for a total of 39 weeks, which was later increased to a total of 50 weeks.  Under the PAC program, for an individual receiving a regular UI benefit, a PUA benefit, or a PEUC benefit between March 29, 2020 and July 25, 2020, the EDD paid an additional $600 in CARES Act funds for each week of benefits.  Between December 26, 2020 and March 14, 2021, the FPUC program provided an additional $300 per week for unemployment.  Examples of non-business-owner occupations that may qualify a person for PUA benefits include realtor, barber, hairstylist, freelance photographer, construction handyman/woman, gardener, and ride-share driver.[2]

18.  The California EDD began accepting applications for PUA benefits on April 28, 2020.  Applications may be made online from any digital device, including smartphones, that connects to

---

primary caregiving responsibility for a child or other household member who is unable to attend school or another facility that is closed as a direct result of the COVID-19 and the school or facility care is required for the claimant to work; becoming the breadwinner or major support for a household because the head of household died due to COVID-19; the claimant has quit his/her job due to COVID-19; the place of employment has closed due to COVID-19; a job that the claimant was scheduled to start is no longer available due to the COVID-19 public health emergency; or the place of employment is inaccessible due to the COVID-19 public health emergency.

[2] To be eligible, such person must also not be participating in the UI Elective Coverage program. Under the provisions of the California UI Code, employers may elect UI and State Disability Insurance (SDI) or only Disability Insurance coverage for themselves. Self-employed individuals, who are not employers, may only elect SDI coverage for themselves.

the Internet and is capable of accessing the EDD website's UI benefits page.  To make benefits available as quickly as possible, payments are issued in phases.  If a claimant qualifies for PUA benefits, the minimum payments are as follows based on the claim's start date:

     a.   <u>Phase 1</u>: For claims with start dates from February 2 to March 28, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

     b.   <u>Phase 2</u>: For claims with start dates from March 29 to July 25, 2020, $167 plus $600 per week for each week the claimant is unemployed due to COVID-19.

     c.   <u>Phase 3</u>: For claims with start dates from July 26 to December 26, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

19.  PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

20.  Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  The EDD may request documentation to provide proof of the stated income.[3]  If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work

---

[3] In general, the EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

as quickly as possible to verify the claimant's income using
other resources available to the EDD in order to increase the
PUA weekly benefit amount.

21.  Like regular UI claims, PUA claims can be filed
online.  When an individual files a PUA claim online, the EDD
automatically maintains certain information regarding the filing
of the claim.  This information includes the date and time the
claim was submitted, the name of the person for whom the claim
was filed, and the IP address of the computer, or Internet
Service Provider ("ISP") account, that was used to file the
claim.

22.  A PUA claimant must answer various questions to
establish eligibility for PUA benefits.  The claimant must
provide name, social security number ("SSN"), and mailing
address.  The claimant must also identify a qualifying
occupational status and COVID-19 related reason for being out of
work.

23.  After it accepts a UI claim, including a claim
submitted pursuant to the PUA program, the EDD typically
deposits UI funds every two weeks to an Electronic Benefit
Payment ("EBP") debit card administered by BofA, which the
claimant can use to pay for his/her expenses.  The EBP card is
sent via the U.S. Postal Service to the claimant at the address
the claimant provides in their UI claim.  Claimants can activate
their debit card over the phone or online.

24.  When receiving regular UI benefits, a claimant must
complete a Continued Claim Form (DE 4581) and certify every two

weeks, under penalty of perjury, that he/she remains unemployed and eligible to receive UI benefits.  The EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  On or about April 23, 2020, California Secretary of Labor Julie Su directed the EDD to temporarily suspend the requirement for UI claimants to provide unemployment certifications (Continued Claim Forms).[4]  The Continued Claim Form was waived to prevent any unnecessary delays in dispensing benefit payments.

25.  At present, weekly PUA benefits typically range from $40 to $450.  In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

26.  The submission of the PUA claims cause mailings to the addresses provided on the claims, including mailings of EBP debit cards administered by BofA that are used to access the fraudulently obtained UI benefits.  The co-schemers and their associates use the EBP debit cards to withdraw the fraudulently obtained UI benefits by making cash withdrawals at Automated Teller Machines ("ATM") and point of sale purchases at merchants across the United States.

**C.   UI Benefit Fraud Schemes**

27.  Based on my conversations with other law enforcement officers, I know that individuals scheming to fraudulently

---

[4] The temporary suspension of the continued claims forms covered the weeks ending March 14, 2020 through May 9, 2020.

obtain UI benefits generally follow recognizable patterns, including, among other indicia:

   a.   Co-schemers commonly buy or outright steal the personally identifiable information ("PII") of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds.  Co-schemers often buy PII from other fraudsters or from the Dark Web[5] (using cryptocurrency such as Bitcoin) and verify that the PII belongs to real persons by checking the PII at background check websites such as Beenverified, Spokeo, Intelius, and Whitepages.

   b.   Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.  Once the EBP debit cards arrive, co-schemers commonly withdraw UI benefits via ATMs or make POS purchases at merchants for goods and services.

   c.   Submitting multiple UI claims from the same IP address for multiple claimants.  These claims are sometimes submitted on the same day close in time.

_____

   [5] Dark Web is the set of web pages on the Internet that cannot be indexed by search engines, are not viewable in a standard web browser, require specific means (such as specialized software or network configuration) in order to access, and use encryption to provide anonymity and privacy for users.  Dark Web has become the Internet's black market in recent years where visitors can make illegal purchases of PII, guns, and drugs, and trade child pornography.

d.    Failing to provide a phone number or provide a wrong number on multiple UI claims so it may be difficult to reach the identity holder.

### IV. STATEMENT OF PROBABLE CAUSE

**A.    Summary of Probable Cause**

28.   The U.S. Department of Labor, Office of Inspector General ("DOL-OIG"), California EDD, FBI, Homeland Security Investigations, and United States Postal Inspection Service are investigating a fraudulent scheme in which the perpetrators fraudulently apply for and obtain UI benefits under the PUA provision of the CARES Act, a provision that is designed to help unemployed individuals obtain UI benefits as part of the nation's response to the economic harms caused by COVID-19.

29.   The investigation initially obtained evidence that at least 27 fraudulent UI claims were filed from EDWARDS's residence located on Courtney Drive in Moreno Valley, California, asserting falsely that the named claimants were self-employed independent contractors who were negatively affected by the COVID-19 pandemic, triggering eligibility for UI benefits under the PUA provision of the CARES Act.  The UI claims submitted in furtherance of the scheme falsely reported income to EDD for the named claimants on their applications, in order to receive UI benefits.

30.   The applications for the fraudulent UI claims asserted that the named claimants were entitled to UI benefits administered by EDD when, in fact, they were not.  At least 6 of the UI claims were for inmates at California state correctional

facilities, including Centinela State Prison in Imperial,
California; Valley State Prison in Chowchilla, California; and
California State Prison Solano in Vacaville, California.  Due to
their custody status, the inmates listed as named claimants were
not were not eligible to apply UI benefits because they were
not: (1) unemployed through no fault of their own; (2) able and
available for work; and/or (3) actively seeking work.  These
actions in concert were material false statements leading to the
theft of federal funds.

31.  The fraudulent UI claims were submitted electronically
using an IP address that was registered EDWARDS's residence
under the name D.J., who I later confirmed to be EDWARDS's
fiancé.  The submission of the UI claims caused mailings to the
addresses provided on the claims, including mailings of EBP
debit cards administered by BofA that were used to access the
fraudulently obtained UI benefits.

32.  A federal search warrant was obtained in Case No.
5:21-MJ-37, approved by the Honorable Sheri Pym, United States
Magistrate Judge, to search EDWARDS's residence and was executed
on February 10, 2021.  During the search FBI seized 5 EBP debit
cards, none of which belonged to EDWARDS or D.J., including two
cards bearing the names of individuals previously identified
from the UI claims filed from EDWARDS's IP Address.  FBI also
seized EDWARDS's and D.J.'s digital devices and approximately
$45,000 in cash.

33.   From July 2020 to August 2020, EDD paid out approximately $455,000 in UI benefits on the 27 claims mentioned above.

**B.   The Scheme to Fraudulently Obtain UI Benefits**

1.   **DOL-OIG Investigates Public Reports of Fraudulent UI Claims Filed Under California Inmates' Names**

34.   Based on my review of reports, conversations with other law enforcement officers, and my own involvement in this investigation, I know the following.

35.   On or about November 24, 2020, as reported in the New York Times, a task force led by district attorneys in San Diego and Fresno Counties sent a letter to California Governor Gavin Newsom raising concerns about widespread fraudulent UI claims being filed by inmates in California correctional facilities.[6]  On December 1, 2020, as reported in the Los Angeles Times, investigators with State of California estimated that approximately $400 million had been disbursed on approximately 21,000 suspected fraudulent UI claims filed using the PII of California prison inmates.[7]

36.   Following these reports of fraudulent UI claims using inmate information, DOL-OIG investigated potentially

---

[6] "Unemployment Scam Using Inmates' Names Cost California Hundreds of Millions," N.Y. Times, Nov. 24, 2020, available at https://www.nytimes.com/2020/11/24/us/california-unemployment-fraud-inmates.html.

[7] "California's Prisoner Unemployment Fraud Now Estimated at $400 Million, Officials Say," L.A. Times, Dec. 1, 2020, available at https://www.latimes.com/california/story/2020-12-01/california-prisoner-unemployment-fraud-estimated-400-million.

fraudulent claims using California inmates' PII.
Specifically, DOL-OIG obtained from the California Department
of Corrections and Rehabilitation ("CDCR") the PII of inmates
housed in CDCR facilities at least since 2018.  The inmates
were those who, due to their incarceration, were ineligible
for UI benefits under the EDD's requirements.  DOL-OIG cross-
referenced the inmates' PII with the data automatically
stored by DOL-OIG and EDD for each UI benefit claim submitted
to EDD.  Through this process, DOL-OIG identified hundreds of
UI claims submitted using CDCR inmates' PII.  After
identifying the IP addresses used to submit the UI claims
using inmates' PII, DOL-OIG identified instances of multiple
UI benefit claims made (both using inmates' PII and non-
inmates' PII) from the same IP addresses.  In some cases,
DOL-OIG found that a single IP address had been used to file
dozens of UI claims resulting in hundreds of thousands of
dollars of UI benefit disbursements.  DOL-OIG then obtained
from ISPs specific subscriber information for the IP
addresses from which multiple UI benefits claims were filed
using CDCR inmates' PII.

   37.  In December 2020, I received information from DOL-
OIG Supervisory Special Agent Michael Blas and SA Christina
Wang, regarding suspected fraudulent UI claims filed with EDD
from an IP address originating in the Central District of
California: 47.149.228.126 (the "Target IP Address").
Records obtained from DOL and EDD databases reflected that
the Target IP Address was used to file at least 27 fraudulent

UI claims with EDD between July 2020 and August 2020.
Approximately 6 of the 27 UI claims filed from the Target IP
Address were for inmates incarcerated in California state
prisons, including Centinela State Prison in Imperial,
California; Valley State Prison in Chowchilla, California; and
California State Prison Solano in Vacaville, California.

    2.   **The UI Claims Were Fraudulent**

    38.   The UI benefits have become a prime target for fraud.
The six UI claims submitted for California state inmates were
fraudulent.  The inmates whose PII had been used to submit UI
claims were not eligible to apply for UI benefits because
they did not meet EDD's eligibility requirements.  Those
inmates were not: (1) unemployed through no fault of their own;
(2) able and available for work; and/or (3) actively seeking
work.

    39.   The remaining 21 UI claims also had indicia of fraud.
Based on my training and experience, I know that individuals
scheming to fraudulently obtain UI benefits generally follow
recognizable patterns, including the following, among others:

        a.   Using the identities of other people to file for
fraudulent UI benefits in the other persons' names and then
collecting the UI funds.  In some instances, the named claimants
are victims of identity theft; in other instances, the named
claimants have provided their personal identifying information
to the schemers and have agreed to pay the schemers a portion of
the fraudulent benefits that are obtained; in yet other
instances, the named claimants believe they may be entitled to

benefits but do not know that the schemers are reporting false information to EDD to fraudulently increase the amount of the benefits claimed.

b.   Using addresses the schemers control as the addresses submitted to EDD for the UI claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.  According to EDD records, three of the 27 UI claims described above used EDWARDS's residence on Courtney Drive in Moreno Valley, California as the claimant's mailing address (and none of the claims were for EDWARDS).

c.   Submitting multiple UI claims from the same IP address for multiple claimants.  As described further below, all of the relevant fraudulent UI claims were submitted from the same Target IP Address associated EDWARDS's residence.

d.   Submitting UI claims close in time.  The majority of the UI claims here were filed between July 2020 and August 2020.

e.   Providing similar or identical identifying information across multiple different claim applications.  In addition to the three UI claims that listed EDWARDS's residence as the claimants' address, the UI claims submitted from the Target IP Address showed the following similarities:

i.   Two UI claims listed as the claimants' address the same address on California Avenue in Bakersfield, California; and

ii.  Ten UI claims listed as the claimants' addresses apartments from the same complex on Beardsley Avenue in Bakersfield, California.

f.  The same or similar mailing addresses were used for 26 of the 27 UI claims submitted from the Target IP address. Twenty-five of the 27 UI claims provided no contact telephone number.  According to law enforcement database queries, the two UI claims that listed telephone numbers used the same claimant address on Highgate Avenue in Victorville, California which was the same address used in a UI claim for C.R. an inmate at Centinela State Prison.  C.R.'s UI claim was submitted online to EDD from the Target IP Address associated with EDWARDS's residence.

3.  **The Fraudulent Claims Were Connected to EDWARDS and the SUBJECT PREMISES**

40.  Further investigation revealed that the fraudulent claims discussed above were connected to EDWARDS and her residence in the following ways:

a.  Records obtained from Frontier Communications, the ISP for the Target IP Address, reflect that at the time the UI claims were submitted online to EDD from the Target IP Address, the subscriber for the Target IP Address was D.J..  As discussed below, EDWARDS stated in a voluntary interview with FBI that D.J. was her fiancé.  The service address for the Target IP address was EDWARDS's residence.  The customer name for the subscriber account associated with the IP Target Address was D.J. and the e-mail address was XXXXXX@gmail.com.

18

The lease for the Target IP address went from July 14, 2020 to August 5, 2020.

        b.    On January 8, 2021, I conducted surveillance at EDWARDS's residence and saw D.J. and EDWARDS, who I identified from their DMV photographs.  I saw EDWARDS and D.J. walk out of the house, take out the trash, and go back inside.  As described more fully below, on February 10, 2021, FBI executed a search warrant at the address associated with the Target IP Address during which agents confirmed that EDWARDS lived at that address with D.J., her fiancé.

        4.    **Sample of the Fraudulent Claims**

    41.    I reviewed a sampling of 6 of the fraudulent UI claims discussed above, which were submitted to EDD between July 2020 and August 2020.

    42.    The table below sets forth a sample of the fraudulent claims for certain California state inmates:

| Claimant | Claim Date | Claimed Reason for Unemployment | Claimed Affected Work | Claimed Amount | Dates of Incarceration |
|---|---|---|---|---|---|
| Charles Redeaux | 07/14/2020 | COVID-19 | Lawn Service Worker | Approved ($7,414) | 6/26/2001- PRESENT |
| Jose Garcia | 07/24/2020 | COVID-19 | Barber | Approved ($5,460) | 4/3/2015- PRESENT |
| Tyrone Jones | 07/24/2020 | COVID-19 | Barber | Approved ($8,762) | 10/3/1997- PRESENT |
| Jermey Heller | 07/26/2020 | COVID-19 | Barber | Approved ($9,390) | 5/16/2018- PRESENT |
| Carlos Martinez | 07/26/2020 | COVID-19 | Lawn Care Specialist | Approved ($9,390) | 12/20/2018- PRESENT |
| Jay Metoyer | 07/31/2020 | COVID-19 | Catering Assistant | Approved ($12,600) | 3/27/2001- PRESENT |

    43.    All six claims were electronically filed from the above-referenced IP address located at EDWARDS's residence.

19

44.   All six claims were filed using similar information, as follows:

      a.   All six claimants reported being unemployed because of a "disaster," namely, "COVID-19";

      b.   Five UI claims selected the following self-attestation: "I am unable to travel due to restrictions";

      c.   All six claims list the same information for "Last Employer" and "Last Employer mailing address"; and

      d.   Four of the six UI claims used the same mailing addresses either on Oregon Street in Bakersfield, California or on Flintlock Trail in Moreno Valley, California.

    5.   **Federal Search Warrant of EDWARDS's Residence**

45.   On February 10, 2021, the FBI executed a search warrant EDWARDS's residence on Courtney Drive in Moreno Valley, California.  The search warrant (5:21-MJ-37) was issued by the United States District Court for the Central District of California and signed by the Honorable Sheri Pym, United States Magistrate Judge.  During the search, the FBI seized five EBP debit cards including two EBP debit card linked to a UI claims filed from EDWARDS' IP address which DOL previously identified. FBI also seized EDWARDS and D.J.'s digital devices and approximately $45,000 in cash.

    6.   **Interview of EDWARDS**

46.   On February 10, 2021, after the execution of the above-reference search warrant, FBI SA Amy Pfeifer conducted a voluntary interview of EDWARDS at her residence.  EDWARDS told us the following:

a.   EDWARDS is engaged to D.J.

b.   EDWARDS had applied for and was receiving UI benefits.

c.   EDWARDS stated that the inmates' information for the UI claims which were filed using her IP address came from her cousin T.T. who is currently incarcerated at a California state prison.[8]

d.   T.T. would give PII of third persons to his girlfriend B.R., who would then pass the information to EDWARDS, so that EDWARDS could file the UI claims.

e.   EDWARDS stated that she filed UI claims for her mother, father, and son.  EDWARDS also stated that her sister-in-law D.W., who is married to EDWARDS's incarcerated brother, filed UI claims which were sent to EDWARDS's parents' house on Highgate Avenue, Victorville, California.

7.   **Review of Digital Devices**

47.   I reviewed the digital devices that were seized from EDWARDS's residence on February 10, 2021.  EDWARDS's cell phone showed that she had conversations with various individuals about EDD claims.  EDWARDS worked with people to file UI claims and had people help her acquire personal information which she used to file UI claims.

---

[8]T.T. is currently incarcerated at Centinela State Prison in California, where at least three other inmates who filed UI claims using EDWARDS' IP address are incarcerated.

21

48.   Specifically, on or about July 22, 2020, J.K.B sent a text message[9] to EDWARDS, which appears to be highly detailed step-by-step instructions on how to file UI claims online using information of minors.   J.K.B.'s instructions stated, among other things, the following:

> "*You need an email address that has never been used with EDD.  Go to the EDD UI website and register for an account under 'Benefits Program Online' after submitting the registration you'll receive a confirmation email, click the link from the confirmation email. It'll say, 'Registration Success' you'll then click on Benefits Program Online, log in to 'UI Online' and File New Claim! Answer NO to the first 6 questions and press NEXT. The next screen you'll enter YOUR CHILDS personal info (social, DOB, etc.) . . .The following screen inquires of the child has worked within the last 18 months. Answer No! . . .  The following screen ask what type of work the child normally performs. Click 'Add Work Type' type in actor and press 'Search', choose actor scroll down and press Save. Do that for questions 1 & 2. You'll answer No to every question EXCEPT #6!! #6 is YES!!*"

---

[9] Text messages include messages sent via SMS text as well as other messaging applications including WhatsApp and Facebook Messenger.

The text message continues to provide specific answers to questions throughout the online UI claim process.  J.K.B. also explained via text message how to certify continued unemployment so that each UI claim continued to receive benefits, and how to check the status of approved UI claims and determine the shipping date for EBP debit cards.

49.  In the following series of messages with J.K.B, EDWARDS agreed to pay J.K.B. $1000 for each minor for whom she filed a UI claim:

a.   On or about July 23, 2020, EDWARDS sent a text message to P.J. asking if she could use P.J.'s address on Oregon Street in Bakersfield, California, to file UI claims.  EDWARDS agreed to pay P.J. $100 for each EBP debit card that sent to P.J.'s. address.  After P.J. allowed EDWARDS to use her address, EDWARDS asked P.J. if she could help EDWARDS find more addresses, so EDWARDS could file additional UI claims.  P.J. sent EDWARDS via text message approximately six addresses, which matched claimants' addresses listed on UI claims filed from EDWARDS's residence and IP address.  Later, EDWARDS exchanged text messages coordinating with P.J. to pick up the EBP debit cards and timesheets.

b.   On or about July 24, 2020, EDWARDS text messaged a contact identified as "KESH."[10]  EDWARDS told KESH that she had been receiving from people in jail her "profiles," which

_____

[10] Based on database checks of the telephone number for the contact "KESH", I believe the telephone number belongs to MARKISHA J.

included the PII of individuals required to file UI claims.
EDWARDS's messages to KESH further explained that EDWARDS's
cousin was talking to people in jail.  EDWARDS then told KESH
that KESH could use four "profiles" per physical address to file
UI claims.  EDWARDS sent KESH profiles to file UI claims.

      c.   On or about July 23, 2020, a contact identified
as "PIG" messaged EDWARDS and asked for cellmate information for
"TRE"[11] for his UI claim.  EDWARDS replied to PIG with TRE's
cellmate information and what appeared to be EDD log-in
information.

      d.   On or about July 28, 2020, EDWARDS sent profiles
to PIG[12] to file UI claims.  EDWARDS told PIG to pay her
approximately $1,000 per day after PIG received the EBP debit
cards from filing the UI claims using the information that
EDWARDS sent.

      e.   The table below sets forth a sample of the
profiles (which included dates of birth and social security
numbers) that EDWARDS sent to KESH and PIG:

//

//

//

//

//

---

    [11] Based on reviewing phone messages and the interview of
EDWARDS, I believe TRE to be C.T.E., who is EDWARDS' brother.

    [12] Based on reviewing EDWARDS messages with PIG and
conducting database checks, I believe PIG to be D.W.

| Profiles EDWARDS sent to KESH | Profiles EDWARDS sent to PIG |
|---|---|
| Brenda R. | Cordero B. |
| Nathaniel G. | Justin P. |
| Letty S. | Maria F. |
| Dayquanna M. | Nolberto F. |
| Justin P. | Andrew N. |
| Brandon M. | Donald A. |
| Demetria P. | Ericka M. |
| | Caterina L. |
| | Nathan M. |
| | Rodney B. |

50. On or about July 29, 2020, EDWARDS messaged PIG the following:

EDWARDS: use a computer

EDWARDS: or a phone that's off just on WiFi

EDWARDS: I did them all on my computer

PIG: ok

EDWARDS: They not gonna be watching like that too many ppl doing it

PIG: K

PIG: It's just the email part

EDWARDS: just cant be foolish like niggas buying a Lamborghini smh

51. Based on my participation in this investigation and my training and experience, I interpret EDWARDS's text messages above to be telling PIG to use a computer to file UI claims and that PIG should not be concerned about being caught filing UI claims (i.e., "they not gonna [sic] be watching like that").

52. On or about September 16, 2020, EDWARDS messaged T.T. to update him about the amount on each of the inmates' EBP debit

cards.  EDWARDS said, "Ok I just logged on to all of them Jones 10k, Jose 16, Carlos 14, Jermey 20."

53.  In the Notes application on EDWARDS's telephone, I found a file that was created on or about June 30, 2020, which showed names listed under addresses that were connected with the UI claims filed from EDWARDS' IP address.

54.  The table below shows the information from the file found in the Notes application on EDWARDS's telephone:

| ANDREW HOUSE | BRENDA HOUSE | Oregon Apt A. | Washington Ave House | Beardsley Apt. 2 | Oregon Apt B. |
|---|---|---|---|---|---|
| TIKKA F. | YEHENIA E. | Nevaeh E. | TOSHALENA | RAYMONTE H. | TYRONE J. |
| DOMINIK M. | ANNA R. | MALIENA G. | JC M. | STEVEN B. | PHILLIP A. |
| JAMAREE T. | AMBROSE | | AALIYAH G. | BREYEA M. | JOSE G. |
| DAVIN O. | DORIAN | | SHARYA A. | | |
| | CLEON J. | | | | |

8.   **REVIEW OF EBP DEBIT CARD STATEMENTS**

55.  I reviewed a spreadsheet prepared by FBI Forensic Accountant Stacy Martin that compiled data from BofA account statements or at least 20 UI claims filed from EDWARDS's IP Address.  The data shows a pattern of transactions consistent with identity theft and fraud based on my training and experience.

56.  Specifically, the summary of transactions show that between August 2020 and November 2020, multiple ATM cash withdrawals were made from the same BofA location in Moreno Valley.  Each cash withdrawal was for the amount of $1,000.  For instance, on September 6, 2020, eight BofA accounts linked to UI claims made from EDWARDS's IP address each made $1,000 ATM cash

withdrawals from a BofA location in Moreno Valley within 10 minutes of each other.  Similarly, two days later, on September 8, 2020, eight BofA accounts linked to UI claims submitted from EDWARDS's IP address each made $1,000 ATM cash withdrawals from a BofA location in Moreno Valley within an hour of each other.

**V.CONCLUSION**

57.  For all the reasons described above, there is probable cause to believe that EDWARDS has committed violations of Title 18, United States Code, Sections 1040 (Fraud in Connection with Emergency Benefits) and 1343 (Wire Fraud).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  __2nd__ day of
April 2021.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE